JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No.: SACV 22-00388-CJC |
| | Bankruptcy Case No.: 8:17-bk-14478-SC |
| Appellant, | Adv. Case No. 8:18-ap-01035-SC |
| v. | ORDER REVERSING THE BANKRUPTCY COURT'S ORDERS GRANTING DEBTOR'S MOTION TO DISMISS AND DENYING FTC'S MOTIONS FOR SUMMARY JUDGMENT |
| DENNIS EDWARD LAKE, | |
| Appellee. | |

I.   INTRODUCTION

This appeal arises out of the bankruptcy of Dennis Edward Lake. In 2016, this Court found Lake liable for assisting violations of the Mortgage Assistance Relief Services Rule and the Telemarketing Services Rule, concluding that he knowingly participated in a scheme to defraud consumers seeking mortgage relief. The Court ruled that Lake was jointly and severally liable for $2,349,885 in ill-gotten gains. In 2019, he pleaded guilty to criminal charges of conspiracy to commit mail fraud on largely the same facts.

In 2017, Lake filed for bankruptcy and sought to have the $2,349,885 debt discharged. The Federal Trade Commission ("FTC") initiated an Adversary Proceeding opposing discharge, arguing that Lake's debt falls under the fraud exception of the Bankruptcy Code, which excepts from discharge debt for money obtained by false pretenses, a false representation, or actual fraud. 11 U.S.C. § 523(a)(2)(A). The FTC argued that the civil and criminal cases against Lake conclusively establish that the debt meets the elements of this exception. However, the Bankruptcy Court rejected the FTC's motion for summary judgment on issue preclusion, concluding that there was an insufficient showing of justifiable reliance, and then granted Lake's motion to dismiss the Adversary Complaint, reasoning that the debt was "for" violations of FTC regulations, not "for" money obtained by false pretenses, a false representation, or actual fraud. Finally, the Bankruptcy Court denied as moot the FTC's renewed motion for partial summary judgment given its ruling on Lake's motion to dismiss. Now before the Court is the FTC's appeal of those three decisions. For the following reasons, the Court **REVERSES** the Bankruptcy Court's orders granting Lake's motion to dismiss and denying the FTC's motions for summary judgment and **REMANDS** with instructions to enter judgment in favor of the FTC.[1]

## II.   BACKGROUND

### A.   The Scheme to Defraud in Which Lake Knowingly Participated

Doing business as "JD United" and "the Advocacy Program," Lake claimed to be in the business of helping distressed homeowners by interviewing them, filing complaints on their behalf in an attempt to persuade banks to negotiate loan modifications, and then working with banks on the "back end" to negotiate loan modifications. *FTC v. Lake*, 181

---

[1] Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing. *See* Fed. R. Civ. P. 78; Local Rule 7-15.

F. Supp. 3d 692, 696 (C.D. Cal. 2016). To retain clients, Lake relied on businesses with distressed homeowner clients to refer them to Lake for his "advocacy" services. *Id.* Two of the companies with which Lake contracted and for which he did back-end processing work were HOPE Services and HAMP Services. *Id.*

The people and entities who ran HOPE Services and HAMP Services (the "HOPE Defendants") and Lake ran a three-phase scheme to defraud homeowners. *Id.* at 697. In the first phase, the HOPE Defendants mailed marketing materials and made unsolicited telephone calls to distressed homeowners, advertising loan modification services. *Id.* They falsely represented to homeowners that they were a government-affiliated nonprofit that could help them obtain loan modifications. *Id.* When a homeowner-consumer expressed interest, HOPE Services requested initial documentation and then congratulated the customer on being "preliminarily approved" for a modification. *Id.*

In the second phase, the HOPE Defendants and their employees informed consumers that they were required to pay a "reinstatement fee"—typically a percentage of the past-due amount owed on the consumer's mortgage—and then make three monthly "trial mortgage payments" into their lender's "trust account," which was actually a HOPE account. *Id.* The HOPE Defendants demanded "certified funds only" and instructed consumers to make the funds payable to HOPE entities, who sometimes had names styled to resemble the consumer's lender. *Id.* After a consumer made the first trial payment, the HOPE Defendants directed them to Lake's "Advocacy Department." *Id.*

The third phase involved Lake: he or one of his employees contacted a consumer, reassured the consumer that the modification process was unfolding (even if the consumer was receiving foreclosure warnings or a sale date was approaching), and asked additional financial questions or requested additional documentation before "advocating" on the consumer's behalf to banks or public officials. *Id.* Lake's role in the scheme was

crucial because it kept consumers making "trial payments" to the HOPE Defendants for months longer than they would have otherwise, all the while accruing interest and penalties with their actual lender. *Id.* Lake believed that he was shielded from liability for the HOPE Defendants' wrongdoing so long as he was only doing "back-end work"—i.e., not marketing directly to consumers or asking them for advance fees himself. *Id.* at 696.

### B. The Civil FTC Enforcement Action

In April 2015, the FTC filed a complaint against the HOPE Defendants for violations of the Mortgage Assistance Relief Services ("MARS") Rule—which regulates the practices of mortgage assistance relief services providers—and the Telemarketing Services Rule ("TSR") —which prohibits deceptive telemarketing acts or practices—and against Lake for assisting in those violations (the "Enforcement Action"). The Court entered summary judgment against Lake, concluding that he substantially assisted the HOPE Defendants in their violations of the MARS Rule and TSR. *Lake*, 181 F. Supp. 3d 692. As to the MARS Rule, the Court concluded that the HOPE Defendants violated the rule by (1) illegally accepting advance fees from clients in violation of 12 C.F.R. § 1015.5,[2] (2) making material misrepresentations to their clients in violation of 12 C.F.R. § 1015.3, particularly regarding government affiliation, the terms of their modifications, and the nature of their trial payments (including telling consumers that their payments were being held in trust for their lenders when they were not), and

---

[2] The advance-fee ban was aimed at "discourage[ing] providers from making deceptive claims" and "provid[ing] additional protection against continued deception in th[e mortgage assistance relief services] industry." Mortgage Assistance Relief Services Rule, 75 Fed. Reg. 75,092, 75,120. Indeed, the National Association of Attorneys General described the advance-fee ban as "critical" and "the linchpin of effective deterrence of fraudulent practices" by MARS providers because "[t]he collection of advance fees virtually ensures that consumers will have no recourse when consultants fail to perform services, as is generally the case." Consumer advocates, community organizations, and legal service providers also stated that a ban was "necessary to ensure that providers deliver the results they promise and to curb deception and abuse." *Id.* at 75, 114.

(3) failing to make mandatory disclosures under 12 C.F.R. § 1015.4. *Id.* at 699. The Court "easily" found that Lake substantially assisted the HOPE Defendants in their violations. *Id.* at 699–700. Specifically, he "played an integral part in [their] scheme, because his 'advocacy' on the back end meant that clients continued to make 'trial payments' to the HOPE Defendants in the hope that they were actually getting something for their money," and he also "conceal[ed] the fact that the clients' advance fees were *not* being held in trust for the clients' banks, as the HOPE Defendants had represented." *Id.* The Court further concluded that Lake knew or consciously avoided knowing that the HOPE Defendants were accepting advance fees, making material misrepresentations, and failing to make mandatory disclosures. *Id.* at 700.

Similarly, as to the TSR, the Court concluded that the HOPE Defendants violated the rule "by accepting fees while telemarketing after making a false statement, by making material misrepresentations while telemarketing," including that consumer payments would be held in trust for their lenders, "and by particularly misrepresenting material aspects of their refund policies while telemarketing," "telling consumers that their payments would all be refunded if a modification fell through." *Id.* at 701. The Court found that Lake substantially assisted these violations and knew or consciously avoided knowing that the HOPE Defendants were violating the TSR. *Id.* Put simply, the Court explained, "[f]raud was the HOPE Defendants' business model, and Lake knew it. Nonetheless he continued contracting with them, continued to assist them in procuring payments from clients, and continued to refuse to inform customers about the location and use of their trial payments." *Id.* (citations omitted).

The Court also concluded that Lake was jointly and severally liable for the full harm caused by both Lake and the HOPE Defendants, explaining that "Lake's involvement on the back-end was crucial to keeping consumers in the scheme long enough to extract additional payments" and that the harm consumers suffered while Lake

persuaded them to "to stick around while he 'advocated' for them with their lenders" was "not capable of apportionment." *Id.* at 702. Accordingly, the Court entered judgment (the "Enforcement Action Judgment") holding Lake personally liable for $2,349,885—the total amount of consumer payments—and permanently enjoining him from working in the mortgage business. Amended Final Judgment and Permanent Injunction, *FTC v. Lake*, No. SACV 15-00585 (C.D. Cal. Mar. 22, 2016) (Dkt. 132).

### C. The Criminal Case

In December 2017, the United States indicted Lake and others for mail fraud, conspiracy to commit mail fraud, and aiding and abetting mail fraud based on the same facts as the Enforcement Action. (FTCER225–50 [Indictment].) In May 2019, Lake pleaded guilty to conspiracy to commit mail fraud. (FTCER258–59 [Plea Agreement], 283–99 [Change of Plea Transcript].) And in January 2020, Judge Andrew J. Guilford found lake guilty based on his plea admissions and convicted him. (FTCER302 [Judgment and Commitment Order].) Judge Guilford did not order Lake to pay any restitution. (*See* FTCER071–72.)

### D. Bankruptcy Adversary Proceeding and the Bankruptcy Court's Orders

In November 2017, after this Court issued the Enforcement Action Judgment but before Lake was indicted, Lake filed a Chapter 7 petition seeking discharge of the debt from the Enforcement Action Judgment. The FTC filed an Adversary Complaint opposing discharge. Lake filed an answer generally denying the allegations. (FTCER041–043.)

//
//

### 1. The FTC's First Motion for Summary Judgment

In July 2020, the FTC moved for summary judgment on the basis that the $2,349,885 Enforcement Action Judgment was excepted from discharge as "debt . . . for money . . . obtained . . . by false pretenses, a false representation or actual fraud." 11 U.S.C. § 523(a)(2)(A). The FTC relied on issue preclusion. It argued that the fully litigated facts determined in the Enforcement Action—as confirmed by Lake's guilty plea—met the elements of the fraud exception to discharge: (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor, (2) knowledge of the falsity or deceptiveness of his statement or conduct, (3) an intent to deceive, (4) justifiable reliance by the creditor on the debtor's statement or conduct, and (5) harm to the creditor proximately caused by its reliance on the debtor's statement or conduct. *See In re Slyman*, 234 F.3d 1081, 1085 (9th Cir. 2000); (FTCER073).

The Bankruptcy Court denied the FTC's motion for summary judgment, holding that the Enforcement Action Judgment did not establish justifiable reliance on Lake's misrepresentations, thus defeating application of the fraud exception to discharge on an issue preclusion theory. (FTCER068–85.). The court explained that because a MARS Rule and TSR violation could in theory be proven without justifiable reliance, this Court did not necessarily decide (as required for issue preclusion) justifiable reliance in the Enforcement Action Judgment, and there were no findings on justifiable reliance in the Enforcement Action to be given preclusive effect in the Adversary Proceeding. (FTCER075-078.)

### 2. Lake's Motion to Dismiss

After discovery, Lake moved to dismiss the Adversary Complaint. The Bankruptcy Court granted Lake's motion to dismiss (which was really a motion for

judgment on the pleadings, since Lake had already filed an answer). (FTCER373–380.) Concluding that "for" in Section 523(a)(2)(A) implied a causal relationship, it held that the Enforcement Action Judgment was a "debt 'for' violating FTC regulations, not a debt 'for' obtaining money by false pretenses, a false representation or actual fraud." (*Id.* at FTCER375–378.) Echoing its earlier conclusions on reliance, the Bankruptcy Court also stated that the Enforcement Action Judgment could only reflect a debt "for" false pretenses, false representations, or actual fraud if this Court had decided any of those things occurred. (FTCER377.) But the Bankruptcy Court concluded that this Court did not find that Lake's debt was obtained by "false pretenses, a false representation or actual fraud" (including because this Court did not find justifiable reliance) and that it did not do so impliedly either because "[a] person can violate the FTC regulations at issue here without obtaining money by false pretenses, a false representation or actual fraud." (FTCER377–379.)

### 3. The FTC's Second Motion for Partial Summary Judgment

Around the time Lake filed his motion to dismiss, the FTC filed a second motion for partial summary judgment, arguing that (1) the evidence in the Adversary Proceeding showed no disputed issues of material fact on the five elements of the fraud exception, and (2) the Enforcement Action Judgment and the Criminal Action precluded relitigating those elements. In the third order on review, the Bankruptcy Court denied the FTC's motion for partial summary judgment as moot given the court's dismissal of the Adversary Complaint. (FTCER381–82.)

## III. LEGAL STANDARD

A district court has jurisdiction to hear appeals from final judgments of the bankruptcy courts. 28 U.S.C. § 158(a)(1); *see also Silver Sage Partners, Ltd. v. City of*

*Desert Hot Springs* (*In re City of Desert Hot Springs*), 339 F.3d 782, 787 (9th Cir. 2003). District courts review de novo bankruptcy courts' orders on motions for summary judgment and motions to dismiss. *In re Wallace*, 259 B.R. 170, 178 (C.D. Cal. 2000) (motions for summary judgment); *In re Signet Solar, Inc.*, 532 B.R. 750, 755 (N.D. Cal. 2015) (motions to dismiss). Whether a claim is excepted from discharge under § 523(a)'s fraud exception presents mixed issues of law and fact and is reviewed de novo. *In re Deitz*, 760 F.3d 1038, 1043 (9th Cir. 2014). "The preclusive effect of a judgment in a prior case presents a mixed question of law and fact in which the legal issues predominate" and is also reviewed de novo. *Robi v. Five Platters, Inc.*, 838 F.2d 318, 321 (9th Cir. 1988). Finally, a district court sitting as an appellate court has the authority to consider any issue presented by the record, even if not addressed by the bankruptcy court. *See In re Pizza of Haw., Inc.*, 761 F.2d 1374, 1379 (9th Cir. 1985).

## IV.  DISCUSSION

On appeal, the FTC argues that the Bankruptcy Court erred by (1) granting Lake's motion to dismiss and (2) denying the FTC's motions for summary judgment. The Court agrees.

### A.  Lake's Motion to Dismiss

Federal Rule of Civil Procedure 12(c), which provides the standard for motions for judgment on the pleadings, applies in bankruptcy proceedings. Fed. R. Bankr. P. 7012(b). "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A Rule 12(c) motion asserting that a plaintiff has failed to state a claim is governed by the same standard as a Rule 12(b)(6) motion to dismiss, a standard which also applies in bankruptcy proceedings. *See* Fed. R. Bankr. P. 7012(b); *United States ex rel. Cafasso v. Gen.*

*Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011); *Webb v. Trader Joe's Co.*, 999 F.3d 1196, 1201 (9th Cir. 2021) (explaining that "motions for judgment on the pleadings are functionally identical to Rule 12(b)(6) motions") (cleaned up). "Judgment [on the pleadings] is properly granted when, taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law." *S.F. Taxi Coal. v. City & Cty. of San Francisco*, 979 F.3d 1220, 1223 (9th Cir. 2020) (cleaned up). In deciding a motion for judgment on the pleadings, courts accept as true all of the nonmovant's factual allegations and construe them in the light most favorable to that party. *Gen. Conf. Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989).

The Bankruptcy Code provides that a debt "for money . . . obtained by . . . false pretenses, a false representation, or actual fraud" is nondischargeable. 11 U.S.C. § 523(a)(2)(A). "The purposes of this provision are to prevent a debtor from retaining the benefits of property obtained by fraudulent means and to ensure that the relief intended for honest debtors does not go to dishonest debtors." *In re Slyman*, 234 F.3d at 1085 (cleaned up). To sufficiently allege that a debt is nondischargeable under the fraud exception, a creditor must allege five elements: "(1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct." *Id.*

The FTC plausibly alleged all five of these elements in its Adversary Complaint. First, it alleged that Lake made misrepresentations or fraudulent omissions, or engaged in deceptive conduct, when he substantially assisted the HOPE Defendants in carrying out the three-phase scheme described above. (FTCER020–40 [Amended Adversary Complaint] at ¶¶ 25–46.) Specifically, it alleged that Lake induced consumers to make

payments to the HOPE Defendants that Lake knew the HOPE Defendants were not allowed to collect and were keeping for themselves rather than holding in trust for the consumers' lenders as consumers thought. (*Id.*) Second, it alleged Lake knew the falsity or deceptiveness of his statements and conduct. (*Id.* ¶¶ 41–53.) Third, it alleged Lake intended to deceive the consumers. (*Id.*) Fourth, it alleged consumers justifiably relied on the HOPE Defendants' and Lake's misrepresentations and deceptive conduct. The HOPE Defendants misrepresented that they were affiliated with the United States Government and that the consumer had received some preliminary modification approval (misrepresentations Lake knew about and failed to correct), and both the HOPE Defendants and Lake discouraged consumers from talking to anyone who might reveal their fraud, including consumers' lenders. (*Id.* ¶¶ 25–29, 35, 38, 44.) And fifth, the FTC alleged that consumers were harmed by their reliance on Lake's statements and conduct—they paid money they thought was going to their lenders but was actually going to the HOPE Defendants.

Because the FTC plausibly alleged all five elements of the fraud exception, Lake's motion to dismiss should have been denied.

B. **The FTC's Motions for Summary Judgment**

The Court turns to whether the FTC established (rather than simply sufficiently alleged) the five elements of the fraud exception through the fully-litigated facts determined in the Enforcement Action, as the FTC argued in its motions for summary judgment. The Court concludes that it did.

"Issue preclusion, or collateral estoppel, refers to the preclusive effect of a judgment in foreclosing relitigation of issues that have been actually and necessarily decided in earlier litigation." *In re Reynoso*, 477 F.3d 1117, 1122 (9th Cir. 2007)

(cleaned up).  "Issue preclusion bars relitigation of issues adjudicated in an earlier proceeding if three requirements are met: (1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom [issue preclusion] is asserted was a party or in privity with a party at the first proceeding."  *Id.*  There is no question that the second and third elements are met—the Enforcement Action ended with a final judgment on the merits and Lake was a party in that proceeding.  The questions, then, are whether each element of the fraud exception was necessarily decided in the Enforcement Action and whether the issues are identical to the issues in that Action.

The Court begins with the fourth element of the fraud exception—justifiable reliance—as that is the element on which the Bankruptcy Court found evidence of issue preclusion lacking.  The Court necessarily found in the Enforcement Action that consumers justifiably relied on Lake's deceptive statements and conduct—the identical issue here—for two reasons.

First, in concluding that Lake was liable for substantially assisting violations of the MARS Rule and the TSR, the Court found that Lake's deceptive conduct—including his "conceal[ment of] the fact that the clients' advance fees were *not* being held in trust for the clients' banks, as the HOPE Defendants had represented," and his "refus[al] to inform customers about the location and use of their trial payments"—was integral to inducing consumers to continue to make trial mortgage payments.  *Lake*, 181 F. Supp. 3d at 700–01 (explaining that Lake's "'advocacy' on the back end meant that clients continued to make 'trial payments' to the HOPE Defendants in the hope that they were actually getting something for their money").  In order for the Court to have decided that Lake's conduct was fraudulent, it necessarily had to decide that consumers justifiably relied on his deceptive statements or omissions.  Reliance is justifiable unless a consumer would have

"at once recognize[d] at first glance" that the relevant statement was false or "from a cursory glance" would have "discovered something which should serve as a warning that he [was] being deceived." *Field v. Mans*, 516 U.S. 59, 71 (1995) (cleaned up); *see In re Kirsh*, 973 F.2d 1454, 1459 (9th Cir. 1992) (explaining, in describing standard for justifiable reliance, that "a person cannot purport to rely on preposterous representations or close his eyes to avoid discovery of the truth" (internal quotation marks omitted)). If the Court had believed that consumers' reliance on Lake's statements or omissions did not meet this standard, it would never have decided that Lake was liable for substantially assisting violations of the MARS Rule or the TSR. Nor did the Court have to state this finding explicitly in order for issue preclusion to apply. *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1321 (9th Cir. 1992) ("When the issue for which preclusion is sought is the only rational one the factfinder could have found, then that issue is considered foreclosed, even if no explicit finding of that issue has been made.").

Second, in concluding that Lake was liable for monetary relief, the Court found that consumers had "reasonably relied" on Lake's misrepresentations—a more demanding finding than that they "justifiably relied" on Lake's misrepresentations. Under then-applicable law, monetary relief was awardable under Section 13(b) of the FTC Act only if the defendant "engaged in misrepresentations or omissions of a kind usually relied on by reasonably prudent persons and that consumer injury resulted." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994). Accordingly, in deciding that Lake should be jointly and severally liable for the full $2,349,885 in ill-gotten gains, the Court necessarily decided that consumers reasonably relied on Lake's misrepresentations. Since reasonable reliance is a higher standard than justifiable reliance, the Court necessarily decided that consumers justifiably relied on Lake's misrepresentations. *See In re Gugliuzza*, 527 B.R. 370, 377 (C.D. Cal. 2015) ("[T]he standard [for justifiable reliance under the fraud exception] is much less demanding than reasonable reliance." (citing *Field*, 516 U.S. 59)).

The other four elements of the fraud exception are also established by the fully-litigated facts of the Enforcement Action.[3] As to the first element—misrepresentation, fraudulent omission, or deceptive conduct—the Court necessarily decided that Lake engaged in deceptive conduct by deciding that he was a knowing and active participant in the HOPE Defendants' fraudulent scheme. *See, e.g.*, *In re Buck*, 75 B.R. 417, 420–21 (Bankr. N.D. Cal. 1987) (concluding that even "a debtor who has made *no* false representation may nevertheless be bound by the fraud of another if a debtor is a knowing and active participant in the scheme to defraud") (emphasis added). The Court also found that Lake actively concealed that consumers' payments were not being held in trust for their lenders, as the HOPE Defendants had told them. *Lake*, 181 F. Supp. 3d at 700. This was a fraudulent omission.

As to the second element—knowledge of the falsity or deceptiveness of his statements or conduct—the Court necessarily decided that Lake knew his conduct was deceptive. Indeed, it stated that Lake "continued contracting with [the HOPE Defendants], continued to assist them in procuring payments from clients, and continued to refuse to inform customers about the location and use of their trial payments," even though "[f]raud was the HOPE Defendants' business model, and Lake knew it." *Id.* at 701.

As to the third element—an intent to deceive—the Court necessarily decided that Lake intended to deceive the consumers so that they would pay the HOPE Defendants and therefore Lake would continue to get paid (since he knew the HOPE Defendants paid him out of the advance fees they illegally received from consumers). *Id.* at 700.

---

[3] A district court reviewing a bankruptcy court ruling may consider issues not ruled on in the bankruptcy court when the issues were "raised sufficiently for the [bankruptcy] court to rule on it." *In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir. 1989).

And as to the fifth element—damage to the creditor proximately caused by its reliance on the debtor's statement or conduct—the Court necessarily decided that consumers paid the HOPE Defendants funds intended for their lenders and were damaged when the HOPE Defendants kept those funds for themselves. *Id.* at 703. The Court determined it was unable to apportion the damage Lake caused to the consumers because it was "impossible to say how much Lake actually harmed each individual" since "their harm continued" while he "persuaded [them] to stick around while he 'advocated' for them with their lenders." *Id.* at 702.

## V. CONCLUSION

For the foregoing reasons, the Bankruptcy Court's orders granting Lake's motion to dismiss and denying the FTC's motions for summary judgment are **REVERSED**. The Court **REMANDS** this case to Bankruptcy Court with instructions to enter judgment in favor of the FTC.

DATED: December 12, 2022

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE